**IN THE UNITED STATES DISTRICT COURT**
**FOR THE MIDDLE DISTRICT OF TENNESSEE**
**NASHVILLE DIVISION**

| | | |
|---|---|---|
| **SHEA T. ADAMS,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | **Case No. 3:18-cv-00384** |
| | ) | **Judge Aleta A. Trauger** |
| **WILLIAMSON MEDICAL CENTER,** | ) | |
| | ) | |
| **Defendant.** | ) | |

## MEMORANDUM

Before the court is defendant Williamson Medical Center's Motion for Summary Judgment (Doc. No. 29), seeking dismissal of plaintiff Shea Adams' claims of hostile work environment, retaliation, and retaliatory harassment in violation of Title VII of the Civil Rights Act of 1964 ("Title VII"), 42 U.S.C. § 2000e *et seq.*

For the reasons set forth herein, the defendant's motion will be granted in part and denied in part. Specifically, the court finds that material factual disputes preclude summary judgment on the plaintiff's hostile work environment claim but will grant summary judgment for the defendant on the plaintiff's retaliation and retaliatory harassment claims.

## I.      MATERIAL FACTS[1] and PROCEDURAL BACKGROUND

Shea Adams began her employment with Williamson Medical Center ("WMC") in 2011 as an EKG Technician. She obtained her nursing degree and license in 2012, after which she began working for WMC as a full-time registered nurse in the Critical Care Unit ("CCU"). She

---

[1] The facts stated herein are drawn from the plaintiff's Response to the Defendant's Statement of Undisputed Material Facts, the pleadings, and the evidentiary materials submitted by both parties in support of their respective positions. Unless otherwise indicated, the facts are undisputed.

transitioned to "as needed," or "PRN," status in August 2015, which she maintained until her resignation on December 3, 2017.

### A. Allegations Regarding Hostile Work Environment

Adams claims that she was subjected to a hostile work environment based on sex while she was employed at WMC. Her claim is based on the comments and conduct of a former colleague named William "Buddy" Dodson and on WMC's response to her complaints about Dodson.

In her Complaint, Adams alleged that Dodson made sexually inappropriate comments to her and to others in her presence, including, but not limited to, the following: (1) while Dodson was assisting a male patient in using the urinal, he called another nurse into the room and asked her if she could handle unzipping the patient's pants and pulling out his penis; (2) he placed a cucumber in an "erect" position on the seat of a chair and told another nurse to "come take a ride"; and (3) he described his son's girlfriend's genitalia while at the nurse's station. (Compl., Doc. No. 1 ¶ 12.)

Adams related these incidents in greater detail during her deposition. The first, involving the patient and the urinal, occurred in 2014. The comment was directed to another colleague, Michelle Clauson. The plaintiff did not witness the initial incident, but she witnessed Dodson's reenactment of it, which occurred when Clauson called her into the room. The plaintiff asked what was wrong, and Dodson repeated his question to Clauson. (Adams Dep. 72–73, Doc. No. 29-1, at 29–30.) Adams did not make a report about the comment, but she believed that Clauson reported it to Jennifer Murphy, director of the CCU and the plaintiff's and Dodson's direct supervisor. (Adams Dep. 73, Doc. No. 29-1, at 30.) Murphy testified that she discussed the incident with Dodson during his annual evaluation, a few months after Clauson complained. (Murphy Dep. 116–18, Doc. No. 29-2, at 24–26.)

The cucumber comment was made to another colleague. Again, the plaintiff did not witness the original incident, but she witnessed the reenactment of it:

> So I don't know the original circumstances. I know Buddy reenacted that for us. Myself, Deborah Stevenson, I think Wes Buchanan was present. . . . [Buddy] walked into our break room and Deborah immediately started telling him to get out of there, he was not welcome. And I said what have you done to Deborah, and Deborah said show her. And so he sat down at the break table, picked up . . . a pen. And he said this was a cucumber and he set it on top of the table erect. And . . . he told everyone in the room that he told Deborah to hop on and take a ride.

(Adams Dep. 74, Doc. No. 29-1, at 31.) Adams claims this incident occurred in the spring of 2016. She and her colleagues who had witnessed the reenactment reported it that day to Jennifer Murphy while they were sitting around the break room table. Murphy told them that they "would just have to overlook Buddy." (*Id.*) Phyllis Molyneux, WMC's former Associate Administrator for Compliance and Human Resources, testified that "Debra Stephens Smith," presumably the same person as "Deborah Stevenson," reported the cucumber incident to her but "long after the fact that it had happened. And she said she chose to deal with it herself." (Molyneux Dep. 33, Doc. No. 29-1, at 5.)

The plaintiff personally heard Dodson's comments about the son's girlfriend's genitalia. On or about Monday, April 25, 2016, Adams made a formal report about the incident to Molyneux, stating that Dodson had made the comments to the plaintiff and another colleague, Daphne Garrett, earlier that month. The plaintiff also claims, in a Declaration filed in response to the defendant's Motion for Summary Judgment, that she "reported to Ms. Molyneux that [she] had repeatedly reported Mr. Dodson's ongoing inappropriate conduct and sexual comments to Jennifer Murphy," but that Murphy told her she "had to ignore or overlook Mr. Dodson's conduct because he makes inappropriate comments all the time." (Adams Sept. 4, 2019 Decl., Doc. No. 33-4 ¶ 2.)

The defendant objects that the plaintiff, prior to the statements in her Declaration, never disclosed that she had made a report to Jennifer Murphy prior to her report to Molyneux or that she complained about Murphy to Molyneux. During her deposition, asked whether she "ever ma[d]e any complaints about [her] work environment while [she was] employed at WMC," Adams responded that she made a report to Phyllis Molyneux in April 2016 regarding Dodson's comments about his son's girlfriend's genitalia. (Adams Dep. 53–54, Doc. No. 29-1, at 19–20.) The defendant's Interrogatories asked the plaintiff to "[i]dentify every individual" she believed had discriminated or retaliated against her in violation of Title VII and to "describe in detail the alleged violation(s) and the role of the individual in the violation(s)." (Doc. No. 35-1, at 6.) The plaintiff described Jennifer Murphy's involvement, in relevant part, as follows:

> After Plaintiff reported to Phyllis Molyneux in HR the hostile work environment due to Buddy Dodson's sexually graphic comments and discussion, the issue was evidently turned over to Ms. Murphy, because she sent Plaintiff a text message to meet with Plaintiff. . . . Ms. Murphy admitted Mr. Dodson's behavior was inappropriate, but stated that if she was going to keep him from behaving inappropriately, she would have to crack down on everyone. . . . In the end, Ms. Murphy did nothing to control Mr. Dodson's behavior and it continued.

(Doc. No. 35-1, at 7.)

A different interrogatory asked the plaintiff to identify each instance in which she complained about the alleged discrimination and retaliation, providing, *inter alia*, the dates on which she complained, the name of the person to whom she complained, any witnesses, the response to her complaint, and whether her complaints were written or oral. (Doc. No. 35-1, at 9.) Adams responded that she reported Dodson's behavior to Molyneux verbally on April 25, 2016 and that she discussed her report to Molyneux with Murphy on June 9, 2016. (*Id.*) She described additional complaints to Molyneux but no other complaints to Murphy. (*Id.* at 10.) She nowhere alleged that she "repeatedly" reported Dodson's inappropriate behavior to Murphy prior

to her formal complaint to Molyneux in April 2016 or that she told Molyneux that she had done so.

Other evidence in the record, however, corroborates the plaintiff's statement in her Declaration that Murphy was aware of the incident before the plaintiff reported it to Molyneux. First, Murphy testified that Molyneux reported to her that Adams had complained about Dodson's sexually inappropriate comments about his son's girlfriend and that Adams believed that Dodson was getting special treatment because of Murphy's friendship with Dodson's wife. While Murphy did not recall investigating the incident—she believed Molyneux and Scott Buchanan, then WMC's Director of Employee Relations and Education, investigated it—she did talk to Daphne Garrett about it, at Molyneux's request. (Murphy Dep. 25–26, Doc. No. 33-2, at 8–9.) Murphy stated that she and Cathy Reinhart, WMC's Assistant Director of Critical Care, met with Daphne Garrett on May 25, 2016. Although Murphy's testimony is somewhat unclear, a memorandum she prepared contemporaneously to document the discussion indicates that she explained to Garrett that she "vaguely recall[ed] a conversation with [Garrett] at the nurses' station several weeks/months ago regarding Buddy discussing his son's sexual encounters." (Doc. No. 29-5, at 45.) In her deposition, Murphy testified that Molyneux wanted her to talk to Garrett because Garrett had related the incident to her around the time it happened, and Garrett and Adams had "told [Molyneux] that [Garrett] had complained, and I didn't listen to her." (Murphy Dep. 124, Doc. No. 29-2, at 29; *see id.* ("So that's why [Molyneux] wanted me to go back.").) Murphy "apologized" to Garrett that she "had not recognized that as a formal complaint." (Murphy Dep. 123–24, Doc. No. 29-2, at 29–30.) In the Memorandum, Murphy stated that she told Garrett that, if she had recognized Garrett's statements about the incident as a "formal complaint . . . , [she] would have formally investigated it." (Doc. No. 29-5, at 45.) She

asked what she could do at that point to fix the problem. Garrett told her that it "wasn't that big of a deal." (*Id.*) Murphy also testified that Garrett, Adams, and two other employees told Molyneux that "Daphne had complained" but that Murphy "didn't listen to her." (Murphy Dep. 124, Doc. No. 29-2, at 29.)

Murphy, along with Scott Buchanan and Cathy Reinhart, met with Dodson on May 25, 2016, for a Performance Accountability Discussion, a formal step in WMC's discipline process. Dodson was counseled at that time against making any sexually inappropriate comments. Murphy stated that the purpose of the discussion was to let Dodson "know that . . . any kind of behavior like that would not be tolerated, nor should he . . . go out and tell people he was getting special treatment. That was wrong, and we were letting him know that was wrong." (Murphy Dep. 95, Doc. No. 29-2, at 22.)

Following this incident, Adams requested that she not be scheduled to work with Dodson. Molyneux informed Adams that they would try to accommodate her request but that it would not always be possible to schedule them on separate shifts. Adams reiterated that she did not want to work with him. (Adams Dep. 72, Doc. No. 29-1, at 29.) An email from Murphy to "Nursing Supervisors," directing them to avoid scheduling Adams and Dodson on the same shift, was not distributed until July 5, 2016. (Doc. No. 29-5, at 41.)

Adams and Dodson were working the same shift the day in early September 2016 when Dodson approached her and another colleague, Amanda Lee, in the cafeteria and asked, "in a very snickery, inappropriate way, what are you going to do with those bananas?" (Adams Dep. 57, Doc. No. 29-1, at 23.) This incident occurred in late August or early September 2016. Adams contacted Molyneux by email on September 3, 2016, informing her that Dodson had made another inappropriate comment to her.

Molyneux initiated an investigation, and Buchanan interviewed both Dodson and Lee. While the investigation was ongoing, WMC discovered that Dodson had discussed the nature of the allegations and the existence of the investigation with another employee. Dodson had been instructed, consistent with WMC policy, to keep the interview confidential. Upon learning that Dodson had breached that confidentiality, Molyneux prepared documentation to terminate Dodson's employment on September 20, 2016, for insubordination. Before Molyneux had the opportunity to terminate his employment, Dodson resigned in order to avoid being terminated.

The plaintiff was asked about other comments by Dodson, in addition to the four instances related above. She responded, "All the time. He made inappropriate comments all the time." (Adams Dep. 75, Doc. No. 29-1, at 32.) She provided other examples and also indicated that, with respect to at least some of these, "they," meaning she and the other nurses with whom she worked, reported the comments "off the cuff" to Jennifer Murphy, who told them, "you guys are just going to have to ignore Buddy. He makes inappropriate comments all the time." (Adams Dep. 75–76, Doc. No. 29-1, at 32–33.) These comments included a story about Dodson's wife wanting to have sex in the woods, which repulsed him; comments about how good the other nurses' hair smelled and "[w]hy couldn't his wife's hair smell like that"; and a complaint that his wife was not as attractive as his general contractor's wife. (*Id.*) Adams testified that the inappropriate comments were "too numerous to count." (Adams Dep. 77–78, Doc. No. 29-1, at 34–35.)

When asked how Dodson's comments interfered with her work, she responded: "Well, it was completely inappropriate. You know, it interfered because you didn't know what he was going to say to you." (Adams Dep. 88, Doc. No. 29-1, at 42.) Although she conceded that his comments never kept her from treating a patient, she would at times have to "compose herself"

after he made "comments like that" and, as a result, "took time away from [her] patients." (*Id.*) An example of such an instance was when he described his son's girlfriend's genitalia. (Adams Dep. 88, Doc. No. 29-1, at 43.) His comments caused her not to want to go to work, but she went because has "ha[d] to have a job." (*Id.*) His comments never made her unable to complete any work tasks, care for a patient, or go to work, but she found the comments "emotionally distressing." (Adams Dep. 88–89, Doc. No. 29-1, at 43–44).

Adams and Dodson worked on different floors, and the plaintiff spent most of her day caring for patients, with only two fifteen-minute breaks and a thirty-minute lunch break per day, which she was frequently too busy to take. (Adams Dep. 89–90, Doc. No. 29-1, at 44–45.) But the nurses often stepped into the break room for water, and Dodson would frequently come down to the break room on her floor to get coffee and "make inappropriate comments." (Adams Dep. 91, Doc. No. 29-1, at 46.) He did not come to her floor on a specific schedule; he came down at "random times" on "random days." (Adams Dep. 92, Doc. No. 29-1, at 47.)

### B. Allegations Regarding Retaliation

Prior to 2014, WMC contracted with Cogent Healthcare, an independent entity, to provide hospitalist services to WMC patients. During the period that hospitalists were provided by Cogent, coordination between WMC and the hospitalists was the responsibility of a program manager. The program manager served as administrative support and a liaison between the hospitalists and WMC; the position at that time was non-clinical.

In 2014, Cogent was acquired by Sound Physicians ("Sound"), which continued to provide hospitalists to WMC under the same contract. However, when Sound purchased Cogent, the program manager position was replaced with a hospitalist RN ("HRN") position. Although the person filling the role was still intended to serve as a liaison, Sound required a clinical background. Cogent's program manager was not an RN and did not have clinical experience.

Sound employed Tonya Parrish, RN, to fill the HRN position. Parrish had the requisite clinical background, but she was not able to manage the hospitalists or act as a true liaison and, as a result, was wholly unsuccessful in the role.

Sound began accepting applications to replace Parrish in 2016. Lori Orme, WMC's Chief Nursing Officer, testified that she and Adam West, Sound's Regional Director of Operations, discussed "on several occasions" that a person with management and leadership skills, rather than clinical skills, was needed for the position. (Orme Dep. 34, Doc. No. 29-7, at 16.) West testified that he had discussions about the program manager Cogent had employed in the position and that he was aware that Orme liked that individual's management style and thought he had performed well in the position. West did not specifically recall that Orme had "identif[ied] . . . anything specific that she was looking for in the hospitalist RN position." (West Dep. 28, Doc. No. 33-8, at 9.) If she had, he would have passed that information on to the people hiring for the position. (*Id.*) Vonetta Bonner, Sound's Regional Nurse Manager at the time, testified that Sound did not include any requirement for management experience in the job description for the HRN position. (Bonner Dep. at 19–24, Doc. No. 33-7, at 7–12.)

Adams applied for the HRN position in June 2016. She was interviewed several times by Sound. Bonner testified that, after the initial rounds of interviews, Adams was one of the top two candidates for the position. (Bonner Dep. 41, Doc. No. 33-7, at 18.) After another round of interviews, Adams was selected as the successful candidate, subject to some additional interviews. (Bonner Dep. 47–48, Doc. No. 33-7, at 20–21; *see also* Bonner Dep. Ex. 9, Doc. No. 33-7, 46 (8/4/2016 email from E. Hilliker v. M. Whitver ("I wanted to provide you on an update on our interviews that went really well!! We really like all of them though our selection will be Shea Adams. We cannot proceed until she has another interview with the Chief. . . ."))). In

addition, West notified Bonner that Lori Orme wanted to "meet with the candidates." (Bonner Dep. 51, Doc. No. 33-7, at 23.) Bonner attempted to communicate to Orme that Sound was looking at Adams for the position, but she never heard back from Orme. (Bonner Dep. 52–53, Doc. No. 33-7, at 24–25.) Orme denies receiving a message from Bonner. (Orme Dep. 35, Doc. No. 33-6, at 17.)

Some individuals at Sound had concerns about Adams' "dynamic personality" and questioned whether her personality was "a little too strong for the team and for the hospital partner." (Bonner Dep. 54, 57, Doc. No. 33-7, at 26, 27.) Bonner recognized that the "key was making sure she was a fit." (Bonner Dep. 57, Doc. No. 33-7, at 27.) Following some discussion about these concerns, a decision was made to continue to proceed with considering Adams for the position. (*Id.*) While Bonner was waiting to hear back from Denise Britt, following her interview with Adams, Bonner agreed with another Sound employee, Matthew Whitver, that, once she heard back from Britt, he would "go ahead and move on with the approvals. And he stated that if the CNO [Lori Orme] said no, then we could look at other candidates, but if not, fine, then we would have everything in place." (Bonner Dep. 61, Doc. No. 33-7, at 30; *see also* Bonner Dep. Ex. 14, Doc. No. 33-7, at 49 (8/19/2016 email from M. Whitver to V. Bonner).) In other words, viewed in the light most favorable to the plaintiff, the evidence indicates that Sound had made the decision to offer the job to Adams unless Orme disapproved.

Bonner testified that Orme's approval of the hire was "not mandated, per se," but that it was important to take the "hospital partner's" concerns or thoughts about any candidate into consideration. (Bonner Dep. 63, Doc. No. 33-7, at 32.) That is, although Sound was not required to follow Orme's wishes, her opinion was a factor that Sound would consider. (Bonner Dep. 64–65, Doc. No. 29-9, at 21–22.) Rather than meet with Adams, Orme met with Adam West, who

reported to Bonner that Orme requested that Sound "look at additional candidates." (Bonner Dep. 66, Doc. No. 29-9, at 23.) Bonner never personally spoke with Orme. However, Bonner communicated to Matthew Whitver and others involved in the hiring process that "the CNO at Williamson did not agree to Shea Adams" and, therefore, that they should begin additional interviews with other candidates. (Bonner Dep. Ex. 15, Doc. No. 33-7, at 51.) Whitver's response was, "Ok wow that was not expected at all," to which Bonner replied, "I know. I am not happy but we need to move ahead." (*Id.*) Several days later, Bonner asked Whitver to notify Adams that Sound had "decided to pursue other candidates." (Bonner Dep. Ex. 16, Doc. No. 33-7, at 54.) Adams was notified on August 31, 2016 that she would not be offered the position. (*Id.* at 53.)

West testified that he spoke briefly with Orme about Adams as a potential candidate for the HRN position. According to West, Orme told him that, "from what she knew about [Sound's] program's history, it might not be the best fit for what we were probably looking for, but yet it was our program and we could do what we wanted." (West Dep. 16, Doc. No. 33-8. at 6.) According to West, Orme did not explain why she though Adams might not be a good fit, and he did not ask. (West Dep. 19, Doc. No. 33-8, at 7.) West then reported to Bonner what Orme had told him. (West Dep. 21, Doc. No. 33-8, at 8.) He also told Bonner that the decision of whom to hire was ultimately up to Sound. (*Id.*)

Orme testified that, when West informed her that Sound's candidate for the HRN position was Shea Adams, Orme was "concerned in that there had been some history with placing an RN in that position, and I was just very concerned that Shea did not have the leadership and management . . . skills that were needed for that position." (Orme Dep. 29, Doc. No. 33-6, at 13.) All she knew about Adams at the time was that she "had been a new RN and part of our new

grad program, . . . that she had only been a nurse for a few years and had not been in any management role for the hospital." (Orme Dep. 30, Doc. No. 33-6, at 14.) She knew Adams had not been in a management role at the hospital, because, if she had been a clinical coordinator or nursing director at the hospital, Orme would have known. She did not know exactly when Adams had graduated from nursing school, but she knew that Adams was a "relatively new nurse." (*Id.*) She did not tell West that Sound should not hire Adams, but she told him that it should look at additional candidates. (Orme Dep. 32, Doc. No. 33-6, at 16.) She did not do any investigation into Adams' background or see her resume; "[i]t was just a phone call." (Orme Dep. 35–36, Doc. No. 33-6, at 17–18.) She had no knowledge of Adams' ability to interact with the hospitalist physicians or hospital staff. (Orme Dep. 40, Doc. No. 33-6, at 19.)

When Sound presented a subsequent candidate, Amanda Dawes, Orme met with her for thirty to forty-five minutes, following which she offered her opinion that Dawes would be a good fit for the position. (Orme Dep. 41, Doc. No. 33-6, at 20.) She had Dawes' resume and knew that she had an MBA and had been at Vanderbilt, in a position where she had staff reporting to her and was managing and leading a team. (Orme Dep. 41–42, Doc. No. 33-6, at 20–21.)

Orme testified that, at the time she spoke with West about Adams, she did not know that Adams had made any complaints to WMC. (Orme Dep. 23, Doc. No. 29-7, at 6.) She was not aware that any employees had made complaints about Dodson and would not have expected Murphy to report those complaints to her. (*Id.*) Nor was she aware that employees had complained that Dodson was receiving favorable treatment from Murphy because of Murphy's friendship with Dodson's wife. (*Id.*) She had been made aware during the evaluation process that there were some issues with Murphy's leadership of the CCU, but she did not "know particulars other than there was some disharmony going on in Critical Care." (Orme Dep. 25, Doc. No. 29-

7, at 8.)

Murphy testified that she did not believe she spoke with Orme about the issues concerning Dodson: "I didn't generally . . . go to Lori [Orme] for this kind of stuff. Usually I went to her for a physician-related or like process related, but not employee [matters]," and particularly not if she was "working with Scott [Buchanan] and Phyllis [Molyneux]." (Murphy Dep. 95, Doc. No. 29-2, at 22.)

The plaintiff points to evidence in the record that she believes supports a conclusion that Murphy did talk to Orme about the plaintiff's complaints about Dodson. Specifically, she points out that Orme reviews the evaluations of approximately 850 employees a year and had no specific recollection of ever reviewing one of Adams' performance appraisals. (Orme Dep. 18, Doc. No. 33-6, at 7.) Orme had never met Adams and would not even know what she looked like. (*Id.*) When West called her to tell her that Sound had selected Adams as its candidate for the liaison position, Orme conducted no investigation to determine what experience Adams had and, although West was supposed to send her a copy of Adams' resume, he had not done so. (Orme Dep. 35–36, Doc. No. 33-6, at 17–18.) Orme had no knowledge of Adams' ability to interact with the hospitalist physicians or the hospital staff. (Orme Dep. 40, Doc. No. 33-6, at 19.) Yet, despite her lack of knowledge of Adams' background and not having seen a resume, she recommended in the phone call with West, off the top of her head, that Sound consider other candidates. The plaintiff suggests that the fact that Orme even recalled who Adams was and remembered anything about her at that moment suggests that she had discussed Adams with Murphy. (*See* Doc. No. 33, at 10–11.)

In addition, Murphy reported directly to Orme. (Orme Dep. 15, Doc. No. 33-6, at 6.) There are documents in the record that show that Murphy sent an email to Orme and others on

June 15, 2015 describing a conversation between Murphy and Adams regarding a market adjustment in pay and Adams' dissatisfaction with Murphy's leadership. (Murphy Dep. 83–86 & Ex. 4, Doc. No. 33-2, at 14–17 & 40–42.) In addition, Murphy wrote a note to Orme regarding the calculation of the plaintiff's scan rate for medication and patients. (Murphy Dep. Ex. 3, Doc. No. 33-2, at 34.)[2] The plaintiff insists that Orme knew that Murphy was having difficulties in her position, knew that her staff were complaining about her, and therefore likely knew that Adams was among those complaining about Murphy. (Doc. No. 33, at 6.)

In early September 2016, Adams contacted Molyneux and Scott Buchanan, claiming that she believed she had received an unfavorable reference from WMC with respect to the Sound HRN position and that she was being retaliated against for her prior complaints. Molyneux and Buchanan investigated the claim. They obtained statements from both Orme and Murphy. Molyneux also communicated with Lindsey Vaughan, Associate Counsel for Sound, who assured her that none of its representatives had received negative feedback from WMC regarding Adams. Molyneux concluded that neither Orme nor Murphy had provided an employment reference to Sound regarding Adams. (Molyneux Dep. 91–93, Doc. No. 29-5, at 30–32.) Molyneux communicated her findings to the plaintiff via letter dated October 5, 2016. (Molyneux Dep. Ex. 17, Doc. No. 29-5, at 63–64.)

In mid-September 2016, Murphy transitioned to a different role, and Mike Stone became Director of CCU and the plaintiff's direct supervisor. Stone did not have any knowledge of the plaintiff's complaints to WMC. According to the plaintiff, Cathy Reinhart incorrectly accused the plaintiff of stealing medication at some point in 2016. The medication was found and the plaintiff was not disciplined. (Adams Dep. 131–34, Doc. No. 29-1, at 56–59; *see also* Reinhart

---

[2] This exhibit is undated, and the excerpts of Murphy's deposition provided by the parties do not encompass her testimony regarding this exhibit.

Dep. 84–85, Doc. No. 29-6, at 10–11 (denying that she ever accused Adams of stealing medication or even thinking that she had stolen medication).) On another occasion, Reinhart relayed a story to Adams to illustrate the goals she should strive for, in which Reinhart used the term "nursing bitch from hell." (Reinhart Dep. 83–84, Doc. No. 29-6, at 9–10.)

The plaintiff voluntarily resigned from WMC effective December 3, 2017.

## II.    LEGAL STANDARD

Summary judgment is appropriate where there is no genuine issue as to any material fact and the movant is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). "By its very terms, this standard provides that the mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–48 (1986). In other words, even if genuine, a factual dispute that is irrelevant or unnecessary under applicable law is of no value in defeating a motion for summary judgment. On the other hand, "summary judgment will not lie if the dispute about a material fact is 'genuine.'" *Id.*

A fact is "material" within the meaning of Rule 56(c) "if its proof or disproof might affect the outcome of the suit under the governing substantive law." *Reeves v. Swift Trans. Co.*, 446 F.3d 637, 640 (6th Cir. 2006). A genuine dispute of material fact exists if the evidence is such that a reasonable jury could return a verdict for the nonmoving party. *Harris v. Klare*, 902 F.3d 630, 634–35 (6th Cir. 2018).

The party bringing the summary judgment motion has the initial burden of identifying portions of the record—including, *inter alia*, depositions, documents, affidavits, or declarations—that it believes demonstrate the absence of a genuine dispute over material facts. *Pittman v. Experian Info. Sols., Inc.*, 901 F.3d 619, 627–28 (6th Cir. 2018); Fed. R. Civ. P.

56(c)(1)(A). The non-moving party must set forth specific facts showing that there is a genuine issue for trial. *Pittman*, 901 F.3d at 628.

The court should view the facts and draw all reasonable inferences in favor of the non-moving party. *Id.* Credibility judgments and weighing of evidence are improper. *Hostettler v. Coll. of Wooster*, 895 F.3d 844, 852 (6th Cir. 2018). As noted above, where there is a genuine dispute as to any material fact, summary judgment is not appropriate. *Id.* The court determines whether sufficient evidence has been presented to make the issue of fact a proper jury question. *Id.* The mere existence of a scintilla of evidence in support of the nonmoving party's position will be insufficient to survive summary judgment; rather, there must be evidence upon which the jury could reasonably find for the nonmoving party. *Rodgers v. Banks*, 344 F.3d 587, 595 (6th Cir. 2003).

## III.     ANALYSIS

### A.     *Hostile Work Environment Claim*

"When the workplace is permeated with 'discriminatory intimidation, ridicule, and insult,' that is 'sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment,' Title VII is violated." *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 21 (1993) (quoting *Meritor Sav. Bank, FSB v. Vinson*, 477 U.S. 57, 65, 67 (1986)). To establish a *prima facie* case of hostile work environment based on sex under Title VII, the plaintiff must prove that (1) she is a member of a protected class; (2) she was subjected to unwelcome harassment; (3) the harassment was based on sex; (4) the harassment created a hostile work environment; and (5) the employer is liable. *Smith v. Rock-Tenn Servs., Inc.*, 813 F.3d 298, 307 (6th Cir. 2016).

In this case, there is no dispute that the plaintiff, as a woman, is a member of a protected class. For purposes of its motion, the defendant does not contest that Adams was subjected to

unwelcome harassment based on sex. However, WMC argues both that the alleged harassment was not sufficiently severe or pervasive to alter the conditions of the plaintiff's employment and that there is no basis for finding the employer liable.

*1.     Whether the Conduct Was Sufficiently Severe or Pervasive*

To be actionable, the hostile work environment "must be both objectively and subjectively offensive, one that a reasonable person would find hostile or abusive, and one that the victim in fact did perceive to be so." *Faragher v. City of Boca Raton*, 524 U.S. 775, 787 (1998). In determining whether alleged harassment is sufficiently severe or pervasive to rise to the level of a "hostile work environment," the court must look at the "totality of the circumstances." *Williams v. Gen. Motors Corp*., 187 F.3d 553, 562 (6th Cir. 1999) (citing *Harris*, 510 U.S. at 23).

Under this test, "the issue is not whether each incident of harassment standing alone is sufficient to sustain the cause of action in a hostile environment case, but whether—taken together—the reported incidents make out such a case." *Id.* Factors relevant to this analysis include "the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." *Harris*, 510 U.S. at 23; *Rock-Tenn*, 813 F.3d at 309. "'[S]imple teasing,' offhand comments, and isolated incidents (unless extremely serious) will not amount to discriminatory changes in the 'terms and conditions of employment.'" *Faragher*, 524 U.S. at 788 (quoting *Oncale v. Sundowner Offshore Servs., Inc.*, 523 U.S. 75, 82 (1998)). The determination of whether harassing conduct is severe or pervasive is "quintessentially a question of fact." *Rock-Tenn*, 813 F.3d at 310 (citations omitted).

The Sixth Circuit has recognized that the determination of whether harassing conduct is sufficiently severe or pervasive to establish a hostile work environment is not susceptible of a

"mathematically precise test." *Abeita v. TransAm. Mailings, Inc.*, 159 F.3d 246, 251 (6th Cir. 1998); *see id.* (noting that the Supreme Court's test uses the phrase "severe *or* pervasive" rather than "severe *and* pervasive" (citing *Harris*, 510 U.S. at 21)). While harassment involving an "element of physical invasion" is more severe than harassing comments alone," *Hawkins v. Anheuser-Busch, Inc.*, 517 F.3d 321, 334 (6th Cir. 2008) (quoting *Williams*, 187 F.3d at 563), "verbal conduct alone can be the basis of a successful hostile work environment claim." *Black v. Zaring Homes, Inc.*, 104 F.3d 822, 826 (6th Cir. 1997). In addition, while the fact that comments are directed to the plaintiff is a factor that may contribute to their severity, "sex-based comments need not be directed at a plaintiff in order to constitute conduct violating Title VII." *Id.*

In *Black*, the Sixth Circuit reversed a jury verdict for the plaintiff, finding, as a matter of law, that her allegations did not show the existence of a hostile work environment. There, the plaintiff alleged that she was the target of sexually harassing comments, typically taking place at biweekly meetings, including one colleague's comment that there was nothing he "'like[d] more in the morning than sticky buns,' while looking plaintiff up and down, smiling, and 'wriggl[ing]' his eyebrows," *id.* at 823; sexually inappropriate suggestions about the name that should be given a piece of property adjacent to a Hooters Restaurant, which occurred at "numerous meetings" and affected the plaintiff's ability to work because she worried that any comment she might make would "throw everybody off for awhile," *id.* at 824; telling the plaintiff she was "paid great money for a woman," *id.*; joking about an individual's name, which was pronounced "bosom," *id.*; asking the plaintiff if she had been out dancing on the tables at a biker bar; and referring to her as a "broad," *id.* The court held that, "viewing the totality of the circumstances," the conduct as alleged by the plaintiff was "merely offensive" and, as such, was not severe or pervasive enough to create an objectively hostile work environment. While the court acknowledged that

sex-based comments did not need to be directed to the plaintiff, "this fact contributes to our conclusion that the conduct here was not severe enough to create an objectively hostile environment." *Id.* at 826 (citing *Baskerville v. Culligan Int'l Co.*, 50 F.3d 428, 430 (7th Cir. 1995)).

On the other hand, in *Abeita*, the district court had granted summary judgment to the defendant, relying on *Black* and finding that the conduct as alleged by the plaintiff was no more severe than that alleged in *Black*. The Sixth Circuit reversed, finding a disputed issue of fact as to whether the conduct in question was sufficiently *pervasive* to create a hostile work environment. There, the harassing supervisor made comments to the plaintiff about wanting to sleep with the models with whom they worked, addressed sexually charged comments to the plaintiff indicating his attraction to her, and repeatedly made sexual comments about wanting to have sex with a model in a Frederick's of Hollywood catalog. The plaintiff testified that the supervisor's sexual comments were "ongoing," "commonplace," "continuing," and "too numerous to recall." *Abeita*, 159 F.3d at 249. She also testified that he made comments about women that were not overtly sexual but "arguably reflect[ed] degrading gender stereotyping," including comments about other female employees' weight but not about male employees' weight. *Id.* The Sixth Circuit agreed that the conduct in question was not particularly severe, but nonetheless determined that summary judgment was not warranted, noting that the district court's analysis omitted the plaintiff's assertion that the supervisor's sexual comments were "commonplace," "ongoing," and "continuing." *Id.* at 252. The appellate court stated:

> This omission is critical because . . . the specific statements made by Katz [the plaintiff's supervisor] in the presence of Abeita and recounted by Abeita appear to be of approximately equal severity to those found in *Black*. Only one of the statements was about [the plaintiff] . . . and it does not appear objectively much more hostile than the "sticky buns" or "dancing on tables" statements in *Black*. The rest of the specific sexual and gendered statements by defendant Katz

concerned women other than the plaintiff, and appear to be of approximately equal severity as those found in *Black*. If these specific statements were the only ones that plaintiff alleged occurred over her nearly seven years of employment, we would agree [that] these specific statements were neither so severe nor so pervasive that a reasonable person could find a hostile work environment.

However, plaintiff's assertion that comments like these were commonplace, ongoing, and continual establishes that the statements were more pervasive or widespread than the ones made in *Black*. . . . [The supervisor's] remarks about his sexual interest in female employees and models went beyond what was job related. Unlike *Black*, the comments here were not the banter of a group. Plaintiff's inability to recount any more specific instances goes to the weight of her testimony, a matter for the finder of facts. Also, Katz . . . made all of the statements at issue here and the plaintiff worked with [him] on a daily basis. These factors . . . help to distinguish the instant case from *Black*.

*Id.*; *accord Armstrong v. Whirlpool Corp.*, 363 F. App'x 317, 318 (6th Cir. 2010) (reversing summary judgment on hostile work environment claim where the plaintiffs adequately alleged that the racially harassing comments were "ongoing, commonplace, and continuous"); *Hawkins*, 517 F.3d at 334 (reversing the district court's grant of summary judgment on the hostile work environment claims of two plaintiffs, in part because the plaintiffs alleged a "campaign of harassment [that] was continuous"); *Ellsworth v. Pot Luck Enters., Inc.*, 624 F. Supp. 2d 868, 879–80 (M.D. Tenn. 2009) (denying summary judgment on the plaintiff's hostile work environment claim, where the plaintiff alleged being propositioned for sex between six and eight times in the six-month period that he worked for the defendant and that sexual comments were made on a daily basis, noting that, "[l]ike the conduct in *Abeita*, the conduct that Ellsworth alleges was continuous, ongoing, and commonplace").

The defendant argues in this case that the plaintiff alleges only a series of non-severe, isolated comments that are merely offensive and that her vague and conclusory allegations of other conduct are not corroborated by other evidence and cannot be used to support her hostile work environment claim. (Doc. No. 30, at 13.) The cases upon which the defendant relies,

however, are inapposite. For instance, in *Ladd v. Grand Trunk Western Railroad, Inc.*, 552 F.3d 495 (6th Cir. 2009), the plaintiff testified that she was subjected to two isolated incidents of equipment tampering and, further, complained very generally that she was subject to unwelcome sexual comments on a daily basis. She had not complained about these comments when they occurred and could only provide one specific example. The Sixth Circuit found that these allegations did not establish discriminatory conduct that was either sufficiently severe or pervasive:

> Ladd in her deposition only testified that one specific incident of the use of a sex- or race-based epithet was directed at her over the entire span of her employment. Indeed, in drawing inferences in her favor for the purposes of summary judgment, we are limited by her total lack of specificity as to verbal abuse she received apart from the aforementioned remarks.

*Id.* at 501; *see also Fuelling v. New Vision Med. Labs. LLC*, 284 F. App'x 247, 259–60 (6th Cir. 2008) (granting summary judgment on hostile work environment claim where plaintiff alleged that she was referred to with derogatory language "on numerous occasions" but was only able to identify the speaker on one occasion); *Fasone v. Clinton Twp.*, No. 97-3267, 1998 WL 165147, at *1 (6th Cir. Apr. 3, 1998) (hostile work environment claim failed where plaintiff alleged "constant harassment" but only identified "a few specific discriminatory comments"); *Cooper v. Jackson-Madison Cty. Gen. Hosp. Dist.*, 742 F. Supp. 2d 941, 956 (W.D. Tenn. 2010) (where the plaintiff could only remember one specific instance of a racial remark, the court found that not sufficient to support his "conclusory assertions" that his supervisor referred to him as "whitey" or "white boy" every time he visited the Brownsville facility); *Amadasu v. Donovan*, No. 1:01-CV-210, 2006 WL 1401648, at *9 (S.D. Ohio May 18, 2006) (holding that the plaintiff's unsupported and conclusory allegations that he was "subjected to unwelcome conduct

constituting harassing racial slurs, epithets, stereotypes, disrespect, verbal abuse and innuendoes" were insufficient to state a prima facie case of hostile work environment).

The court finds that the facts of this case are more similar to those of *Abeita* than to those of *Black* or the other cases finding that the plaintiffs' conclusory allegations of constant harassment were insufficient. Dodson's alleged harassing conduct was not particularly severe, but the plaintiff has identified at least seven specific incidents of inappropriate conduct and alleges, further, that his harassing behavior was ongoing and continuing: "All the time. He made inappropriate comments all the time." (Adams Dep. 75, Doc. No. 29-1, at 32.) As in *Abeita*, the plaintiff's "inability to recount any more specific instances goes to the weight of her testimony, a matter for the finder of facts." *Abeita*, 159 F.3d at 252. In addition, although the plaintiff failed to provide specifics as to how frequently she was in contact with Dodson, she alleged that he came down to her floor and into the break room on her floor frequently for no reason. It also appears that, at times at least, they were assigned to work on the same floor. The evidence in her favor is not strong, but it is sufficient to create a material factual dispute as to whether Dodson's conduct was sufficiently severe or pervasive to give rise to an objectively hostile work environment.

The defendant also argues that the plaintiff has not shown that she subjectively perceived the conduct to be harassing. However, she and others reported Dodson's conduct numerous times to Murphy, her direct supervisor, who failed to take any effective action and appeared to minimize or excuse the behavior. Adams finally made two formal reports to Molyneux. *See Powers v. Chase Bankcard Servs., Inc.*, No. 2:10-cv-332, 2012 WL 1021704, at *9 (S.D. Ohio Mar. 26, 2012) ("Plaintiffs consistently complained to their mangers about the environment, which demonstrates they were subjectively offended by the working conditions . . . .").

The defendant further argues that there is no evidence that the plaintiff's job performance

was affected by Dodson's conduct. Indeed, courts have found that, where there is no evidence that the harassment caused a plaintiff not to perform her job duties, or to perform them in a substandard fashion, there is no genuine issue of fact as to whether the harassment unreasonably interfered with her ability to do her job. *See, e.g.*, *Kelly v. Senior Ctrs., Inc.*, 169 F. App'x 423, 430 (6th Cir. 2006). In this case, however, the plaintiff alleges that she personally found Dodson's conduct to be "emotionally distressing" to the point that it caused her not to want to go to work; that it interfered with her performance of her job "because you didn't know what he was going to say to you"; and that, although she was never prevented from treating a patient, she would at times have to "compose herself" after he made comments, which "took time away from [her] patients." (Adams Dep. 87–89 Doc. No. 29-1, at 41–44.) That is, she adequately alleges that Dodson's conduct made it more difficult to do her job. *See Gallagher v. C.H. Robinson Worldwide, Inc.*, 567 F.3d 263, 274 (6th Cir. 2009) ("[T]he district court also erred in requiring evidence that Gallagher's work performance suffered measurably as a result of the harassment. . . . In *Williams*, the court made it clear that a plaintiff need not prove a tangible decline in her work productivity; only 'that the harassment made it more difficult to do the job.'" (quoting *Williams*, 187 F.3d at 567).

Again, the court cannot find that the evidence is so one-sided that no reasonable jury could find in favor of the plaintiff on the question of whether the harassment was subjectively offensive to the plaintiff to the point of creating a hostile work environment.

### 2.     *Whether the Employer May Be Liable*

Even after a hostile work environment has been established, for an employer to be liable, the plaintiff must show both that the employer knew or should have known of the conduct and failed to take prompt and appropriate corrective action. *Rock-Tenn*, 813 F.3d at 307. Generally, "when the allegations of sexual harassment involve a coworker and the employer has fashioned a

response, the employer will only be liable 'if its response manifests indifference or unreasonableness in light of the facts the employer knew or should have known.'" *McCombs v. Meijer, Inc.*, 395 F.3d 346, 353 (6th Cir. 2005) (quoting *Blankenship v. Parke Care Ctrs., Inc.*, 123 F.3d 868, 872 (6th Cir. 1997)). "The act of discrimination by the employer in such a case is not the harassment, but rather the inappropriate response to the charges of harassment." *Id.* Evidence that a supervisor knew of the harassing conduct suffices to establish constructive notice. *Baugham v. Battered Women, Inc.*, 211 F. App'x 432, 439 (6th Cir. 2006) (citing *Randolph v. Ohio Dep't of Youth Servs.*, 453 F.3d 724, 735 (6th Cir. 2006)).

The defendant argues that the plaintiff only reported two instances of sexual harassment to WMC, by making formal reports to Molyneux. It argues that WMC responded appropriately to both: Jennifer Murphy addressed the first in a formal disciplinary session, and Molyneux investigated the second, but Dodson resigned before any formal disciplinary action arising from the alleged harassment could be taken. The plaintiff, however, has alleged sufficient facts to show that her direct supervisor, Jennifer Murphy, was aware of Dodson's inappropriate behavior but repeatedly minimized it, telling the plaintiff and her colleagues that they should ignore or overlook his conduct. Moreover, Dodson had a documented history of making inappropriate comments, as another employee had reported harassing behavior in 2014. The evidence in the record is sufficient to give rise to a question of fact as to whether WMC knew or should have known about Dodson's harassing behavior well before the plaintiff reported it directly to Molyneux. To be clear, a jury could also find that the plaintiff and other employees, in making their complaints about Dodson to Murphy, were complaining generally that his conduct was inappropriate and offensive but not that it that it was sufficiently offensive to create a hostile work environment. Regardless, this is an issue for the jury.

Likewise, viewing the evidence in the light most favorable to Adams, a jury could find that Murphy's inaction amounted to indifference or unreasonableness. *Accord McCombs*, 395 F.3d at 355. Murphy addressed the 2014 complaint only by discussing it with Dodson during his annual performance appraisal, several months after the event. Even after the plaintiff reported the comments about Dodson's son's girlfriend to Molyneux in the spring of 2016 and asked that she not be required to work at the same time as Dodson, it appears that it took a period of several months for this request to be distributed to the supervisors in charge of scheduling, and, even then, the plaintiff received no guarantee that she would not be required to work at the same time as Dodson. Further, the incident that took place in September 2016 established that she did, at times, continue to be scheduled at the same time as he was and that the previous counseling he had received had no effect. Based on this evidence, a jury could find that the defendant did not take prompt and effective remedial action in response to the plaintiff's complaints.

In sum, the court finds that the defendant is not entitled to summary judgment on the plaintiff's hostile work environment claim.

### B.      Retaliation Claim

To make a *prima facie* showing of Title VII retaliation, an employee must show "(1) he . . . engaged in protected activity, (2) the employer knew of the exercise of the protected right, (3) the defendant took an action that was 'materially adverse' to the plaintiff, and (4) there was a causal connection between the protected activity and the adverse employment action." *Laughlin v. City of Cleveland*, 633 F. App'x 312, 315 (6th Cir. 2015) (quoting *Niswander v. Cincinnati Ins. Co.*, 529 F.3d 714, 720 (6th Cir. 2008)). "If the employee makes this showing, the burden shifts to the employer to articulate a legitimate, nondiscriminatory reason for its actions. If the employer meets this burden, the employee must demonstrate that the legitimate reason offered by the employer was a pretext designed to mask retaliation." *Id.* (quoting *Imwalle v. Reliance Med.*

*Prods., Inc.*, 515 F.3d 531, 544 (6th Cir. 2008)). A plaintiff can demonstrate pretext by showing that the proffered reason (1) has no basis in fact, (2) did not actually motivate the defendant's challenged conduct, or (3) was insufficient to motivate the challenged conduct. *Blizzard v. Marion Tech. Coll.*, 698 F.3d 275, 285 (6th Cir. 2012) (citations omitted). "The three-part test need not be applied rigidly. Rather, '[p]retext is a commonsense inquiry: did the employer fire the employee for the stated reason or not?'" *Id.* (quoting *Chen v. Dow Chem. Co.*, 580 F.3d 394, 400 (6th Cir. 2009)).

The defendant argues that the plaintiff cannot establish "knowledge of the protected activity," because Lori Orme did not know that Adams had engaged in protected activity. The defendant also argues that the plaintiff cannot prove a "causal connection," because she cannot show that Orme's failure to support her candidacy was the "but for" cause of Sound's decision not to hire her. (Doc. No. 30, at 17–18.) Finally, WMC argues that, even if the plaintiff could make out a *prima facie* case of retaliation, she cannot show that Orme's proffered reason for her action is pretextual.

Regarding the second element of her claim, the plaintiff must establish *Orme's* knowledge of the protected activity, not simply WMC's knowledge. *Accord Taylor v. Geithner*, 703 F.3d 328, 336 (6th Cir. 2013) (stating the plaintiff was required to show that the supervisor who took the adverse action knew of the plaintiff's protected activity); *Frazier v. USF Holland, Inc.*, 250 F. App'x 142, 148 (6th Cir. 2007) ("The decisionmaker's knowledge of the protected activity is an essential element of the prima facie case of unlawful retaliation." (citing *Mulhall v. Ashcroft*, 287 F.3d 543, 551 (6th Cir. 2002)); *see also Scott v. Eastman Chem. Co.*, 275 F. App'x 466, 482 (6th Cir. 2008) ("[E]ven to prove a causal connection, Scott must establish that the decisionmakers involved in the promotions at issue had knowledge of the protected activity, as

one cannot retaliate against an employee for engaging in protected activity unless he knew the employee had done so.").

The plaintiff does not allege that she informed Orme about her complaint, and Orme denies any knowledge that anyone had complained about Dodson. (Orme Dep. 23, Doc. No. 29-7, at 6.) Murphy testified that she did not believe she told Orme and that this type of personnel dispute was not the kind of thing she would ordinarily discuss with Orme, particularly if Molyneux or Buchanan was involved, as was the case here. (Murphy Dep. 95–96, Doc. No. 33-2, at 18–19.)

The plaintiff argues that "ample" circumstantial evidence supports the inference that Orme had discussed the matter with Murphy. (Doc. No. 33, at 6.) She argues that Murphy reported directly to Orme and that Murphy kept Orme "informed of matters in the CCU pertaining to Plaintiff." (*Id.*) Her examples of that assertion are that, on one occasion in June 2015, Murphy sent Orme and others an email "describing a conversation with Plaintiff regarding a market adjustment in pay and Plaintiff's dissatisfaction with Murphy's leadership." (*Id.* (citing Murphy Dep. 83–84 & Ex. 4, Doc. No. 33-2, at 14–15 & 40–42).) In addition, Murphy wrote a note to Orme "regarding the calculation of Plaintiff's scan rate for medication and patients." (*Id.* (citing Murphy Dep. Ex. 3, Doc. No. 33-4, at 32).) The plaintiff also argues that Orme admittedly knew that, around the same timeframe that Adams was making her complaints, Murphy was experiencing personal and professional difficulties. Orme was aware of these difficulties and the "disharmony" in the CCU. (*Id.* at 7.)

The evidence offered by the plaintiff is simply not enough to permit a reasonable jury to draw the inference that Orme and Murphy discussed the plaintiff's complaints about Dodson. The plaintiff can point to only two instances of documented personnel-related contact between

Orme and Murphy regarding the plaintiff. The absence of additional contacts tends to substantiate Murphy's statement that she rarely went to Orme with personnel issues unless they were "process-related" or "physician-related." (Murphy Dep. 95, Doc. No. 33-2, at 18.) None of the email exchanges in the record regarding the Dodson complaints reflects that Orme was copied on them, and no witness testified that Orme would have been involved or had any reason to know about the complaints. The plaintiff's speculation that Orme must have known is just that: speculation. While circumstantial evidence can support a reasonable inference of the decisionmaker's knowledge of protected activity, such evidence must be comprised of "specific facts," not merely "conspiratorial theories," "flights of fancy, speculations, hunches, intuitions, or rumors," *Mulhall*, 287 F.3d at 552, particularly "[w]here the decisionmaker denies having knowledge of the alleged protected activity." *Profitt v. Metro. Gov't*, 150 F. App'x 439, 443 (6th Cir. 2005).

The plaintiff suggests that the only logical explanation for Orme's recommendation to Sound that it consider other candidates is that Orme was aware of the plaintiff's protected activity, because otherwise there is no reason that Orme should have even known who the plaintiff was off the top of her head during the telephone call with Adam West. This objection, again, amounts to pure speculation and does not rely on specific facts that constitute circumstantial evidence of Orme's knowledge.

The court finds that the plaintiff has failed to carry her burden of showing that Orme was aware of the plaintiff's protected activity and, therefore, cannot prove that Orme's statement to Sound was retaliatory. The defendant is entitled to summary judgment on this claim.

### C.     *Retaliatory Harassment*

The Complaint may also be reasonably construed as asserting a claim of retaliatory harassment. The plaintiff alleges that, after being removed from consideration for the HRN

position with Sound and making her second formal complaint to Molyneux about Dodson, she was subjected to increased scrutiny of her job performance. (Doc. No. 1 ¶ 30.) WMC moves for summary judgment on this claim. (Doc. No. 30, at 19–20.) Adams did not respond to this argument, either factually or legally. In its Reply, WMC asserts that Adams has abandoned any argument with respect to her claim of retaliatory harassment. (Doc. No. 35, at 7 n.2.)

Irrespective of the plaintiff's failure to respond, "[t]he party bringing the summary judgment motion has the initial burden of informing the Court of the basis for its motion and identifying portions of the record that demonstrate the absence of a genuine dispute over material facts." *Rodgers v. Banks*, 344 F.3d 587, 595 (6th Cir. 2003). The moving party may satisfy this burden by presenting affirmative evidence that negates an element of the non-moving party's claim or by demonstrating an absence of evidence to support the nonmoving party's case. *Id.* Rather than presuming that the plaintiff has abandoned the claim, the court must consider whether the defendant has met its initial burden and demonstrated that it is entitled to judgment as a matter of law on this claim.

The Sixth Circuit has recognized that retaliatory harassment by a supervisor is actionable under Title VII. *Barrett v. Whirlpool Corp.*, 556 F.3d 502, 516 (6th Cir. 2009) (citing *Morris v. Oldham Cty. Fiscal Court*, 201 F.3d 784, 792 (6th Cir. 2000)). The elements of the claim are identical to an ordinary Title VII retaliation claim, except that the plaintiff must show that she was subjected to "severe or pervasive retaliatory harassment," rather than a single materially adverse action, that was causally connected to her engaging in protected activity. *Id.*

The court finds that WMC has met its burden of informing the court of the "basis for its motion and identifying portions of the record that demonstrate the absence of a genuine dispute over material facts." *Rodgers*, 344 F.3d at 595. WMC discusses the evidence in the record and

points out that there is no evidence that one of the two supervisors who allegedly subjected Adams to increased scrutiny—Mike Stone, Murphy's successor—had knowledge of the plaintiff's complaints about Dodson. And the two incidents involving Cathy Reinhart that the plaintiff identifies as harassing are not sufficiently severe or pervasive to constitute retaliatory harassment. The court will grant the motion for summary judgment on this claim as well.

## IV.    CONCLUSION

For the reasons set forth herein, the defendant's Motion for Summary Judgment will be granted in part and denied in part. An appropriate order is filed herewith.

_____
ALETA A. TRAUGER
United States District Judge